No. 31          August 6, 2015          619

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

DAVID FRANK LANE,
*Respondent on Review.*

(CC 07C49819; CA A148507; SC S062045)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 18, 2014.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna Joyce, Solicitor General.

Daniel C. Bennett, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

LANDAU, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____
    * Appeal from Marion County Circuit Court, Joseph V. Ochoa, Judge. 260 Or App 549, 318 P3d 750 (2014).

**LANDAU, J.**

Oregon's sentencing guidelines provide that, if a defendant with multiple terms of probation commits a single probation violation, any resulting terms of incarceration must be imposed concurrently, not consecutively. OAR 213-012-0040(2)(a). At issue in this case is whether that guidelines provision runs afoul of Article I, section 44(1)(b), of the Oregon Constitution, adopted by the voters in 1999 upon referral by the legislature. That section provides that "[n]o law shall limit a court's authority to sentence a criminal defendant consecutively for crimes against different victims." *Id.* The trial court held that the guidelines provision conflicts with the constitution and imposed consecutive sentences on defendant. The Court of Appeals reversed, concluding that, because the imposition of terms of incarceration as a sanction for probation violation is not "sentenc[ing] \*\*\* for crimes" within the meaning of Article I, section 44(1)(b), there is no conflict, so the guidelines provision validly prohibited the imposition of consecutive sentences. *State v. Lane*, 260 Or App 549, 557-58, 318 P3d 750 (2014). We conclude that the trial court correctly determined that the guidelines provision conflicts with Article I, section 44(1)(b). Imposing terms of incarceration as a sanction upon probation revocation amounts to "sentenc[ing] \*\*\* for crimes" within the meaning of the constitution. Article I, section 44(1)(b), therefore controls, and the conflicting provision of the guidelines is invalid. We therefore affirm the trial court and reverse the Court of Appeals.

The relevant facts are few and undisputed. Defendant was indicted in 2007 for four counts of encouraging child sex abuse in the first degree, ORS 163.684, each count involving a different victim. In 2008, he pleaded no contest to those counts and stipulated that there had been multiple victims. Each count was classified as 8-I on the sentencing gridblock, with a presumptive prison sentence of 16 to 18 months. The trial court, however, sentenced defendant to a dispositional departure sentence of 60 months probation on each count. The judgments of conviction and sentences did not specify that they were consecutive; accordingly, they were concurrent. *See* ORS 137.123(1) ("A sentence shall be deemed to be a concurrent term unless the judgment

expressly provides for consecutive sentences."). Among the conditions of probation was that defendant refrain from drinking alcohol.

In 2010, defendant was charged with violating that condition of probation. He admitted that he had done so by drinking alcohol. The parties agree that that was a single probation violation.

The state argued that, in consequence of the probation violation, the trial court should revoke probation and impose consecutive sentences of incarceration on each of the four counts, in light of the fact that the original charges involved four different victims. Defendant objected, arguing that, under the applicable provision of the sentencing guidelines, any terms of incarceration imposed as a result of a single probation violation must be served concurrently. The state did not contest that the guidelines so provide. Instead, the state argued that, notwithstanding the guidelines, the court had authority to impose consecutive sentences under Article I, section 44(1)(b). The trial court agreed with the state, concluding that, under Article I, section 44(1)(b), it was "allowed to give consecutive sentences in this case, based upon the fact that there were four separate victims." The court imposed consecutive sentences totaling 36 months. Specifically, it imposed 18-month concurrent sentences on counts 1 and 2, and 18-month concurrent sentences on counts 3 and 4, but it made the sentences on counts 3 and 4 consecutive to the sentences on counts 1 and 2.

Defendant appealed, contesting the state's argument that Article I, section 44(1)(b), trumped the sentencing guidelines. In defendant's view, the constitutional provision applies only to a court's authority to "sentence," while the sentencing guidelines provision at issue concerned the trial court's imposition of "sanctions" for a probation violation. The two, defendant argued, are not the same thing.

The Court of Appeals agreed with defendant. The court reasoned that Article I, section 44(1)(b), applies only to a court's authority "to sentence *** for crimes." 260 Or App at 554. Sanctions for probation violations, the court explained, are not punishments for crimes; rather, they are punishments for violating probation conditions. Accordingly,

the court concluded, the constitutional provision concerning the authority of courts "to sentence * * * for crimes" does not apply to terms of incarceration imposed for probation violations. *Id.* at 557-58. The state sought review from this court.

The issue before us on review is a narrow one. The parties agree that, but for the possible application of Article I, section 44(1)(b), the sentencing guidelines require concurrent sentences for any terms of incarceration that the court imposes as a sanction for his single probation violation. The sole question is whether Article I, section 44(1)(b), applies.

Because the dispositive question is whether that constitutional provision applies to the imposition of sanctions for probation violations, we begin with a brief description of the law pertaining to the imposition of such sanctions before turning to the interpretation of Article I, section 44(1)(b). Historically, probation amounted to the conditional release of a defendant after conviction but before any sentence for that crime commenced. *State v. Ludwig*, 218 Or 483, 486-87, 344 P2d 764 (1959). That was accomplished in either of two ways: First, the court could suspend the imposition of the sentence itself, so that sentencing did not occur unless the defendant violated the terms of probation. Second, the court could impose sentence, but suspend the execution of the sentence. *See State v. Stevens*, 253 Or 563, 565, 456 P2d 494 (1969) (noting ways in which trial court could impose probation); *see also generally* Arthur W. Campbell, *Law of Sentencing* § 5:1, 149 (3d ed 2004).

Practical consequences flowed from electing one method of probation over another. If the court opted to suspend the imposition of sentence, then it retained the authority to impose any sentence that the law allowed in the case of a probation violation. But, if the court opted to suspend the execution of the sentence, the court was limited to executing the sentence already imposed in the event of a probation violation.

In 1989, the legislature overhauled the state's sentencing laws for felonies committed on or after November 1, 1989, by authorizing the Oregon Criminal Justice Commission to adopt and implement sentencing guidelines.

*See generally [State v. Nix](#)*, 356 Or 768, 775, 345 P3d 768 (2015) (summarizing guidelines). Those guidelines are administrative rules, of which the legislature has expressed approval, although without formally adopting them as statutes. *[State v. Langdon](#)*, 330 Or 72, 74, 999 P2d 1127 (2000). The guidelines create a system of presumptive sentences based on the seriousness of the felony at issue and the defendant's criminal history. They include authority to "impose an optional probationary sentence," provided the sentencing court makes required findings. OAR 213-005-0006(1). They also include presumptive probationary sentences for certain specified circumstances. OAR 213-005-0008.

Under the sentencing guidelines, there is no mention of the historic distinction between suspending the imposition of a sentence, as opposed to suspending the execution of a sentence. The guidelines refer to probation itself as a "sentence." OAR 213-005-0006(1) ("the sentencing judge may impose an optional probationary sentence"). The guidelines also establish sanctions for probation revocation. The guidelines explicitly refer to those sanctions as "sentence[s] upon revocation." *E.g.*, OAR 213-010-0002(1) ("For those offenders whose presumptive sentence was probation, the sentence upon revocation shall be to the supervisory authority for a term up to a maximum of six months."). Those sentences upon revocation may include terms of incarceration. *Id.*

The guidelines limit the sentences that may be imposed upon revocation. Among them is the provision at issue in this case, which states that, "[i]f more than one term of probationary supervision is revoked for a single supervision violation, the sentencing judge shall impose the incarceration sanctions concurrently." OAR 213-012-0040(2)(a).

With that background in mind, we turn to the question whether Article I, section 44(1)(b), applies to OAR 213-012-0040(2)(a). That question is one of constitutional interpretation. In construing the constitution, we examine the text of the disputed provision in its historical context, along with relevant cases interpreting it. *[Couey v. Atkins](#)*, 357 Or 460, 490, ___ P3d ___ (2015). In the case of provisions of the original 1857 constitution, we attempt to ascertain the

meaning understood by the framers at that time. *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54-55, 11 P3d 228 (2000). In the case of provisions adopted later by initiative or referral, the focus is on the meaning understood by the voters who adopted them. *Id.* at 56-57; *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559-60, 871 P2d 106 (1994). In either case, our purpose is not to freeze the meaning of the constitutional provision to the time of its adoption, but is instead "to identify, in light of the meaning understood by the framers [or voters], relevant underlying principles that may inform our application of the constitutional text to modern circumstances." *State v. Davis*, 350 Or 440, 446, 256 P3d 1075 (2011).

We begin with the text of Article I, section 44, which provides that

"(1)(a)  A term of imprisonment imposed by a judge in open court may not be set aside or otherwise not carried out, except as authorized by the sentencing court or through the subsequent exercise of:

"(A)  The power of the Governor to grant reprieves, commutations and pardons; or

"(B)  Judicial authority to grant appellate or post-conviction relief.

"(b)  No law shall limit a court's authority to sentence a criminal defendant consecutively for crimes against different victims."

The particular words at issue in this case are "to sentence *** for crimes," as used in paragraph (1)(b). Defendant argues that to impose a sanction for a probation violation is not "to sentence *** for crimes." In his view, the sanction for a probation violation is just that—a consequence of the violation of conditions of probation, not a punishment for the underlying criminal offense. The state, on the other hand, argues that to impose a sanction for a probation violation can involve imposing a term of incarceration based on the underlying criminal offense and is, thus, sentencing for that criminal offense.

The constitution does not define the word "sentence." The ordinary meaning of the term, however, suggests that it

broadly applies to the imposition or punishment for a crime or some other offense. *See Wright v. Turner,* 354 Or 815, 827, 322 P3d 483 (2014) (undefined terms are assumed to have ordinary meanings). *Webster's*, for example, defines the verb "sentence" as follows:

> "2 a : to pronounce sentence on : to condemn to penalty or punishment <the defendant was *sentenced* at the conclusion of the trial> b : to prescribe a penalty or punishment of : DOOM—usu. used with *to* <was tried on the charge of inciting to riot and *sentenced* to 30 days in jail —E.S. Bates>"

*Webster's Third New Int'l Dictionary* 2068 (unabridged ed 2002). The definitions themselves generally refer to condemning to or prescribing a penalty or punishment, which seems to readily include the imposition of the sort of probation revocation sanctions at issue in this case. To be sure, the verbal illustrations (the material enclosed in angle brackets) refer more particularly to a sentence imposed "at the conclusion of the trial." But the fact that a particular illustration is more limited does not necessarily mean that the definition is likewise. *See id*. at 17a, 13 (Verbal Illustration) (explaining function of verbal illustration portion of definitions); *see also The American Heritage Dictionary of the English Language* 1597 (5th ed 2011) (defining verb form as "[t]o impose a sentence on" and the noun as "[t]he penalty imposed by a law court or other authority upon someone found guilty of a crime or other offense"); XIV *The Oxford English Dictionary* 992 (2d ed 1989) ("to pronounce sentence upon; to condemn to a punishment").[1]

       The immediate context of the disputed phrase seems likewise to support its broader interpretation. Paragraph (1)(a) of Article I, section 44, begins with "[a] term of imprisonment imposed by a judge in open court" and later refers to the court that does so as "the sentencing court." Article I, section 44(1), thus appears to equate "sentencing" with "[a] term of imprisonment imposed by a judge

---

[1] Legal dictionaries similarly define the word broadly. *Black's* defines the word "sentencing" as "[t]he judicial determination of the penalty for a crime." *Black's Law Dictionary* 1486 (9th ed 2009); *see also Ballentine's Law Dictionary* 1160 (3d ed 1969) ("formally declaring to the accused the legal consequences of the guilt which he has confessed or of which he has been convicted"); *West's Legal Thesaurus/Dictionary* 687 (1985) ("[t]o impose a punishment").

in open court." Again, that seems broad enough to include a term of imprisonment imposed as a sanction for a probation violation.

At the same time, Article I, section 44(1)(b), does refer to sentencing "for crimes." As we have noted, defendant argues that, even if a revocation is in some sense a "sentence," it is not a sentence "for crimes." The state responds that defendant misapprehends the nature of the sanction, which is based on the underlying criminal offense. We agree with the state.

The imposition of sanctions certainly may, in some sense, act as a punishment for the probation violation. *See, e.g.*, ORS 137.592 (expressing policy of "responding to [probation] violations with swift, certain and fair punishments"). The actual term of incarceration, however, depends not on the nature of the probation violation, but entirely on the seriousness of the underlying criminal offense and the offender's criminal history. Defendant in this case, for example, was not sentenced to several years of incarceration for drinking a beer. Instead, the length of the term of incarceration was dictated by the nature of the earlier felonies to which he had pleaded no contest.

Any other interpretation leads to difficulties. If, for example, two offenders were sentenced to probation for different underlying offenses, and both violated the terms of that probation by drinking alcohol and had their probation revoked, they could be subject to wildly disparate sanctions depending on the nature of the underlying offenses. If the sanctions were solely a punishment for the same parole violation—irrespective of the underlying criminal offenses— they certainly would be open to constitutional challenge based on the disparate consequences imposed for the identical conduct.

Casting a wider net, we also consider the historical context, which includes related statutes and regulations that existed at the time Article I, section 44(1)(b), was adopted. *State v. Sagdal*, 356 Or 639, 642, 343 P3d 226 (2015) (historical context for purposes of interpreting constitutional provision includes preexisting legal framework). In that regard, defendant argues that the broader context

reveals an "unambiguous" distinction between imposing a sentence for a crime and imposing a sanction upon probation revocation. Based on that distinction, he argues, the voters who adopted Article I, section 44(1)(b), would have understood that to "sentence" did not include imposing probation revocation sanction. We do not find such a clear distinction in the relevant statutes and regulations, however.

There is no question but that a number of statutes describe the penalties for a probation violation as a "sanction." ORS 137.593(1), for example, provides that, for persons who violate the conditions of their probation, the relevant corrections agency "shall impose structured, intermediate sanctions," though the agency does not have the power to revoke probation. The statutes additionally direct the Department of Corrections to "establish[] a system of structured, intermediate probation violation sanctions" for that purpose. ORS 137.595(1). Meanwhile, the sentencing court retains authority to revoke probation, and "to impose sanctions for the [probation] violations," if the court stated on the record that it retained that authority at the time of sentencing. ORS 137.593(2)(a), (b). And ORS 137.545(5)(b) provides that, "[f]or defendants sentenced for felonies committed on or after November 1, 1989, the court that imposed the probationary sentence may revoke probation supervision and impose a sanction as provided by rules of the Oregon Criminal Justice Commission."

Certain provisions of the sentencing guidelines also use similar phrasing. The one at issue in this case, for example, repeatedly uses the term "sanction" to refer to the consequences of probation violation:

"(2)   When an offender is serving multiple terms of probationary supervision, the sentencing judge may impose *revocation sanctions* for supervision violations as provided by OAR 213-010-0002 for the violation of each separate term of probationary supervision.

"(a)   If more than one term of probationary supervision is revoked for a single supervision violation, the sentencing judge shall impose the *incarceration sanctions* concurrently.

"(b)   If more than one term of probationary supervision is revoked for separate supervision violations, the

sentencing judge may impose the *incarceration sanctions* concurrently or consecutively."

OAR 213-012-0040(2) (emphases added).

But the mere fact that the legislature or the Oregon Criminal Justice Commission has used two different terms does not, by itself, require the terms to have different meanings. Although the use of different terms usually is taken to connote different meanings to avoid redundancy, *see, e.g.*, *State v. Connally*, 339 Or 583, 591, 125 P3d 1254 (2005) (so stating), it is not a hard-and-fast rule. As this court explained in *State v. Cloutier*, 351 Or 68, 97-98, 261 P3d 1234 (2011), redundancy "is a fact of life and of law. *** In some cases, it may be what the legislature intended." *See also* *Thomas Creek Lumber and Log Co. v. Dept. of Rev.*, 344 Or 131, 138, 178 P3d 217 (2008) ("[N]othing prohibits the legislature from saying the same thing twice."). Such "rules" of interpretation are mere assumptions that always give way to more direct evidence of legislative intent.

In this case, that some statutes or administrative rules use the different terms is counterbalanced by the fact that other statutes and regulations use the terms to suggest the very same thing. That is to say, other statutes and rules—contrary to defendant's categorical assertion that imposing a sanction is not sentencing—refer to the imposition of a sanction for probation violations as "sentencing."

ORS 137.712(5), for instance, which creates certain exceptions to mandatory minimum sentences, describes the penalty on revocation of probation as a "sentence":

"Notwithstanding ORS 137.545(5)(b), if a person sentenced to probation under this section violates a condition of probation by committing a new crime, the court shall *revoke the probation and impose the presumptive sentence of imprisonment* under the rules of the Oregon Criminal Justice Commission."

(Emphasis added.) Similarly, ORS 161.585 provides that certain crimes will be treated as felonies unless and until certain events occur, in which case those crimes will thereafter be treated as misdemeanors. One of the triggering events is that the court imposes a "sentence" after revoking

probation: "Upon revocation of probation, the court imposes a sentence of imprisonment other than to the legal and physical custody of the Department of Corrections." ORS 161.585(2)(c). And ORS 137.010(7) provides that, "when a suspended sentence or sentence of probation is revoked, the court shall impose the following sentence," including a term of imprisonment.

The statute authorizing appeals of probation revocation similarly assumes that any resulting sanctions are "sentences." ORS 138.222(7) provides that "[e]ither the state or the defendant may appeal a judgment of conviction based on the sentence for a felony committed on or after November 1, 1989." But it adds the qualification that the defendant is permitted to appeal only upon "showing a colorable claim of error" in a proceeding in which, among other things, "[p]robation was revoked." ORS 138.222(7)(b). That, in fact, is the very statute that defendant in this case has invoked as the basis for this appeal. But the statute applies only to appeals of a judgment of conviction based on a "sentence." If the imposition of probation sanctions were not "sentencing," then defendant would lack a statutory basis for pursuing this very appeal.

Defendant concedes that there is some "tension" in the statute in that regard. He suggests that we should read ORS 138.222(7)(b) to authorize appeals of probation revocation sanctions, regardless of whether they may be regarded as "sentences." That, however, is not what the statute says. As we have noted, the statute begins with the authorization to appeal a "judgment of conviction based on the sentence." The statute then adds a qualification that applies to defendants, namely, that they may pursue such appeals of judgments of conviction based on the sentence only if they can show a colorable claim of error in the probation revocation proceeding. By its terms, the statute does not independently authorize an appeal of probation revocation decisions.

In the sentencing guidelines, there also are references to probation revocation sanctions as "sentences." As we have noted, for example, OAR 213-010-0002 repeatedly refers to a probation revocation sanction as a "sentence upon revocation" of probation:

"(1)    For those offenders whose presumptive sentence was probation, the *sentence upon revocation* shall be to the supervisory authority for a term up to a maximum of six months.

"(2)    For those offenders whose probationary sentence was either a departure from a presumptive prison sentence or a sentence imposed pursuant to OAR 213-005-0006, the *sentence upon revocation* shall be a prison term up to the maximum presumptive prison term which could have been imposed initially, if the presumptive prison term exceeds 12 months. For those presumptive prison terms 12 months or less, the *sentence upon revocation* shall be to the supervisory authority, up to the maximum presumptive prison term.

"* * * * *

"(4)    When imposing a revocation sanction, the sentencing judge shall also set a term of post-prison supervision in accordance with OAR 213-005-0002.

"(5)    No revocation sanction may exceed the limitations established by this rule."

(Emphases added.)

The foregoing counterexamples defeat defendant's contention that the voters who adopted Article I, section 44(1)(b), would have understood a well-established and "unambiguous" distinction between imposing probation revocation sanctions and sentencing. To the contrary, they show that relevant statutes and administrative rules repeatedly refer to probation revocation sanctions as "sentences."

The relevant history of the adoption of Article I, section 44(1)(b), is scant. But it confirms what our analysis of the text suggests. *See Sagdal*, 356 Or at 642 (cautioning against ending analysis without considering history); *Ecumenical Ministries*, 318 Or at 559 n 7 (same). As we have noted, what is now Article I, section 44(1)(b), was adopted by the voters upon referral from the legislature. The history of a measure adopted by the people consists of those contemporary sources that indicate how the voters understood the measure, particularly the ballot title and associated information in the

voters' pamphlet. *See Sagdal*, 356 Or at 642-43 (discussing historical sources); *Ecumenical Ministries*, 318 Or at 560 n 8 (same).

Both defendant and the state agree that nothing in the ballot title, the explanatory statement, or any of the arguments for or against the amendment directly addresses whether the voters understood the words "to sentence" to refer to the court's imposition of penalties on revoking probation. Defendant, however, contends that the absence of any such discussion confirms his point; that is, he argues that, in light of the well-established distinction between probation revocation "sanctions" and "sentences," any intention to alter that distinction would have been evident in the enactment history. But defendant's argument in that regard assumes the very matter in contention, namely, whether there existed any such well-established distinction. As we have discussed, the relevant statutes and administrative rules do not support such a categorical distinction.

For its part, the state relies on a comment made in the legislature during the process that led to the amendment being submitted to the voters, specifically an explanation of the measure by Representative Mannix before the Senate Judiciary Committee. When Representative Mannix was asked for an example of a current law that restricts a judge's ability to impose consecutive sentences, he responded:

> "[M]y recollection under sentencing guidelines is there are restrictions on consecutive sentences under a number of circumstances and I—those who are dealing with them on a daily basis would probably come up with specific case examples. But my understanding is the sentencing guidelines contain an inherent bias against consecutive sentences and the judge has to *** jump over some obstacles. This says [no]—you can't limit the judge's authority to sentence, for different victims, consecutive sentences, and so if the sentencing guidelines contain any such provisons they would be rendered ineffective."

Audio Recording, Senate Committee on Judiciary, HJR 94, June 8, 1999, at 1:32:17 (statement of Rep Mannix), http://www.leg.state.or.us/listn/archive/archive.1999s/SJUD-199906081500.ram (accessed July 24, 2015). According to the state, the only "restriction[] on consecutive sentences"

that existed at the time that Representative Mannix offered that explanation, was the one at issue in this case, OAR 213-012-0040(2)(a). Thus, the state concludes, it is clear that, in referring what became Article I, section 44(1)(b), to the people, the legislature intended to override the very restriction on consecutive sentences that is at issue in this case.

Defendant's response to the state's reliance on the statement of Representative Mannix is three-fold. First, he contends that, under this court's decision in *Shilo Inn v. Multnomah County*, 333 Or 101, 36 P3d 954 (2001), *modified on recons on other grounds*, 334 Or 11, 45 P3d 107 (2002), such statements are not properly considered part of a measure's enactment history. Second, he argues that, even assuming the relevance of such history generally, Representative Mannix's statement—referring to *multiple* limitations that reflect a "bias" against consecutive sentencing in the guidelines—suggests that he was referring not just to the sole such limitation that existed at that time, but to other limitations that Mannix apparently was unaware had been eliminated; in other words, Mannix was mistaken. Moreover, defendant argues, the reason Mannix was mistaken confirms the existence of a clear distinction between sentencing for crimes and imposing sanctions upon probation revocation. Finally, defendant contends that, even if that was not the case, the fact that the only then-existing limitation on consecutive sentencing was the one at issue in this case is irrelevant. In defendant's view, what became Article I, section 44(1)(b), was intended to restrict only the legislature's *future* enactment of such limitations and was not intended to affect those that already existed.

We begin with *Shilo Inn*. In that case, this court considered the proper interpretation of a constitutional amendment that the legislature had referred to voters. On review, *amici curiae* argued for a particular interpretation of that amendment, based in part on statements that various legislators had made during the process of referring the measure to the voters. The court declined to considered such comments, explaining that "the history that we consider does not include early drafts of the legislative bill that later was referred to the people, nor does it include statements made by legislators in hearings on that matter." *Id*. at 129.

The court noted that such evidence might be material to the legislature's intentions in referring the matter, but not to the voters' intentions in adopting it. *Id.* at 129-30.

*Shilo Inn* adopted an artificially blinkered view of the process by which measures are adopted. Voters do not approve a referred measure in a vacuum. As required by Article XVII of the state constitution, amendments such as Article I, section 44(1)(b), are drafted by the legislature, acting in its capacity as the collective representative of the people. Those proposed amendments are then subject to the hearings and deliberations that are part of that process and, if approved by the legislature, referred by the Secretary of State to the voters. That legislative deliberation is a part of the constitutionally mandated adoption process. It is conducted in public, and its records are available to the public. Although the measure that the legislature refers becomes effective only if ultimately approved by the voters, the voters have the opportunity to give their approval only after the legislature drafts a measure and, after deliberation, deems it worthy of submission to them. Under the circumstances, the legislature's deliberations seem no less worthy of consideration than the deliberations of a legislative committee in referring a bill to the floor of the House or the Senate. Certainly, they are at least as germane to the intended meaning of a measure as a newspaper editorial that we have no way of knowing anyone actually read. *See Ecumenical Ministries*, 318 at 560 n 8 (a measure's history includes contemporaneous newspaper reports and editorials).

That does not necessarily mean that such legislative history will have significant weight. As always, the weight that the courts will accord a particular bit of enactment history will depend on the circumstances—including the clarity with which the legislature's or the people's intentions have been expressed in the text of an enactment and the nature of the history itself. *See State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) ("[W]hether the court will conclude that the particular legislative history on which a party relies is of assistance in determining legislative intent will depend on the substance and probative quality of the legislative history itself.").

In this case, Representative Mannix's explanation does appear to support the conclusion that Article I, section 44(1)(b), applies to the sentencing guidelines limitation on consecutive sentencing at issue in this case. As the state contends—and defendant does not contest—that limitation was the only such limitation on consecutive sentencing that existed at the time.

Defendant's argument that Mannix appears to have misapprehended the state of the law at the time of his remarks is unavailing. To the extent that defendant is correct, it means that Mannix erroneously understood that there were other limitations in addition to the one at issue in this case that would be affected by the adoption of Article I, section 44(1)(b). Perhaps it demonstrates that Mannix incorrectly thought that the adoption of the amendment would have had greater effect than it actually did. But it does nothing to demonstrate that it failed to have at least the effect of eliminating the sole obstacle to the imposition of consecutive sentencing that actually existed at that time.

Defendant contends that, in any event, the reason that OAR 213-012-0040(2) was the only limitation on consecutive sentencing at that time suggests that the legislature was aware of a clear distinction between sentencing for crimes and imposing sanctions on probation revocation. According to defendant, in 1996, the voters approved Ballot Measure 40, which enumerated a number of crime victims' rights, including a right to have convicted criminals sentenced consecutively for crimes against different victims. *See generally State v. Fugate*, 332 Or 195, 199, 26 P3d 802 (2001) (summarizing measure). Measure 40 was declared unconstitutional in *Armatta v. Kitzhaber*, 327 Or 250, 252, 959 P2d 49 (1998). But, in the meantime, the legislature passed Senate Bill 936, legislation implementing the measure, which legislation included sections explicitly directing the Oregon Criminal Justice Commission to amend specified sentencing guidelines rules limiting the authority of courts to impose consecutive sentences. Or Laws 1997, ch 313, §§ 26, 27. That legislation did not direct the commission to amend what is now OAR 213-012-0040(2). In defendant's view, the clear implication is that the legislature did not view that rule to involve sentencing for a crime.

Even assuming defendant's reading of the history of SB 936 is accurate, it is not clear that Representative Mannix or any other legislator was aware of it; indeed, defendant's point appears to be that Mannix was *not* aware of it. Thus, at best, it introduces some ambiguity in the legislative history, but offers nothing clearly to the contrary of what our analysis of the text in context demonstrates.

There remains defendant's argument that, even if Representative Mannix accurately referred to the sole remaining limitation on the imposition of consecutive sentencing, Article I, section 44(1)(b), was not intended to displace that limitation but, instead, was intended only to prohibit as yet unenacted legislative limitations on the imposition of consecutive sentences. Defendant claims to find support for that reading of the constitution in the measure's ballot title, specifically its "yes" vote result statement, which states that the measure "guarantees consecutive sentencing authority," and the summary, which states that the measure "also bars laws limiting consecutive sentences for crimes against certain victims." He also relies on the explanatory statement, which states that the measure "also prohibits laws that would limit a court's authority to sentence a person consecutively for crimes committed against different victims." Official Voters' Pamphlet— Statewide Measures, Special Election, Nov 2, 1999, 38. According to defendant, that phrasing suggests "a prospective limitation on the authority of a future legislature to enact limitations on a sentencing judge's ability to impose consecutive sentences." And, finally, he relies on one of the arguments in favor of the measure, which states that the measure "prohibits the Legislature from passing laws that limit the authority of the sentencing judge from imposing consecutive sentences" for crimes against different victims. *Id.* at 39 (argument in favor by Steve Doell, Crime Victims United).

Defendant's conclusion, however, does not follow from the evidence on which he relies. To begin with, defendant fails to identify any wording in the text of Article I, section 44(1)(b), that even arguably suggests that the amendment was intended to prohibit only future laws, leaving in place any existing restrictions on consecutive sentencing.

Thus, it is not at all clear what wording of the constitution defendant's evidence is supposed to illuminate. Aside from that, the portions of the enactment history on which he relies do not fairly convey the meaning that he ascribes to them. The fact that a proposed amendment, for example, "bars" or "prohibits" laws limiting consecutive sentences for certain crimes, by itself, does not suggest that it bars or prohibits such laws only prospectively.

Defendant argues that, even if it is not clear that Article I, section 44(1)(b), does not apply to probation revocation sanctions, we should adopt that interpretation of the provision to avoid its possible unconstitutionality. Specifically, he asserts that, if Article I, section 44(1)(b), "allows that people may be 'sentenced' once for committing a crime and 'sentenced' again for violating probation, it violates the Fifth Amendment's [double jeopardy] bar against multiple punishments for the same offense."

We are not persuaded. The canon of interpretation that counsels avoidance of unconstitutionality applies only when a disputed provision remains unclear after examination of its text in context and in light of its enactment history. *See State v. Kitzman*, 323 Or 589, 602, 920 P2d 134 (1996) (if legislative intent remains unclear after considering text, context, and legislative history, court may apply maxim that, "when one plausible construction of a statute is constitutional and another plausible construction of a statute is unconstitutional, courts will assume that the legislature intended the constitutional meaning"). In light of our analysis of the text of Article I, section 44(1)(b), in its context, and in light of its enactment history, it is not clear to us—and defendant does not explain—the nature of the persistent ambiguity that application of the avoidance canon ordinarily requires.

In any event, defendant is incorrect that construing Article I, section 44(1)(b), to apply to probation violation sanctions poses constitutional difficulties. It has long been held that the constitutional double jeopardy prohibition is not offended by the imposition of probation revocation sanctions. *See, e.g., United States v. DiFrancesco*, 449 US 117, 137, 101 S Ct 426, 66 L Ed 2d 328 (1980) (noting

that "there is no double jeopardy protection against revocation of probation and the imposition of imprisonment"). Moreover, the rationale for that holding has nothing to do with whether the imposition of probation revocation sanctions amounts to "sentencing." In fact, in *DiFrancesco*, the United States Supreme Court rejected the argument that a statute allowing the government to appeal a defendant's sentence would result in multiple sentencing and thus run afoul of the double jeopardy prohibition. *Id*. at 136-37; *see also State v. Barrett*, 350 Or 390, 405-07, 255 P3d 472 (2011) (explaining *DiFrancesco*). Rather, the rationale turns on the fact that the offender, by his or her own actions, triggers the conditions that permit the imposition of sanctions. *See, e.g.*, *Ralston v. Robinson*, 454 US 201, 220 n 14, 102 S Ct 233, 70 L Ed 2d 345 (1981) ("Such a scheme hardly constitutes multiple punishments, since the offender has, by his own actions, triggered the condition that permits the appropriate modification of the terms of confinement.").

In short, we conclude that the text in context along with its enactment history reveal that the voters most likely understood that the prohibition in Article I, section 44(1)(b)—that no law may limit a court's authority to impose consecutive sentences for crimes against multiple victims—applies to the imposition of probation violation sanctions. The text of the constitutional provision indicates that a "sentence" is "[a] term of imprisonment imposed by a judge in open court." That is precisely what occurs when a trial court imposes a term of imprisonment as a probation revocation sanction. Consistently with that reading of the text, multiple statutes and administrative rules refer to probation revocation sanctions as "sentences." In fact, defendant could not bring this appeal were the imposition of such sanctions not "sentencing." The legislative history, although meager, tends to confirm that reading of the constitution; there certainly is no history that contradicts it.

In reaching that conclusion, we emphasize that Article I, section 44(1)(b), does not necessarily *require* the imposition of consecutive sentences when there are multiple victims. By its terms it forecloses any other law from *limiting* a court's authority to impose such sentencing where there are multiple victims.

In this case, because OAR 213-012-0040(2)(a) limited the trial court's authority to sentence defendant consecutively for his crimes against different victims, Article I, section 44(1)(b), invalidated it. The trial court thus did not err in concluding that it has authority to impose consecutive sentences. The Court of Appeals did err when it concluded that the constitutional provision does not apply to prison terms imposed as a penalty for a probation violation.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.