854 September 21, 2017 No. 49

IN THE SUPREME COURT OF THE
STATE OF OREGON

George WITTEMYER,
*Petitioner on Review,*

*v.*

CITY OF PORTLAND,
*Respondent on Review.*

(CC 130304234; CA A154844; SC S064205)

On review from the Court of Appeals.*

Argued and submitted March 6, 2017, at Lewis & Clark Law School, Portland.

George Wittemyer, *pro se,* Portland, argued the cause and filed the briefs on behalf of himself as petitioner on review.

Denis M. Vannier, Deputy City Attorney, City of Portland, argued the cause and filed the brief on behalf of respondent on review.

John A. Bogdanski, *pro se,* Portland, argued the cause and filed the on behalf of himself as *amicus curiae*.

Kristian Roggendorf, Lake Oswego, filed the brief on behalf of *amicus curiae* Eric Fruits, Ph.D.

Sean O'Day, League of Oregon Cities, Salem, filed the brief for *amicus curiae* League of Oregon Cities.

P.K. Runkles-Pearson, Miller Nash Graham & Dunn LLP, Portland, filed the brief on behalf of *amicus curiae* Portland Public School District.

_____
   * On appeal from Multnomah County Circuit Court, Kelly Skye, Judge. 278 Or App 746, 377 P3d 589 (2016).

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Nakamoto, and Flynn, Justices.**

LANDAU, J.

The decision of the Court of Appeals and the limited judgment of the circuit court are affirmed.

_____

** Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case. Brewer, J., retired June 30, 2017, and did not participate in the decision of this case. Duncan, J., did not participate in the consideration or decision of this case.

**LANDAU, J.**

The Portland City Code imposes a $35 tax on each resident of the city who is at least 18 years old, has income of $1,000 or more per year, and does not reside in a household that is at or below federal poverty guidelines. The funds generated by the tax are used to support public art and music education programs. Plaintiff, a city resident, argues that the "arts tax" violates Article IX, section 1a, of the Oregon Constitution, a provision adopted in 1910 that prohibits the imposition of a "poll or head tax." He asserts that the tax violates the state constitution because all who are subject to it are required to pay the same amount, without regard to their income. The City of Portland argues that its arts tax does not violate the state constitutional prohibition on poll or head taxes because the tax does take income into account: Those residents who earn less than $1,000 per year or are within a household that is at or below federal poverty guidelines do not have to pay the tax at all.

We conclude that a tax that takes into account the income, property, or other resources of taxpayers is not a "poll or head tax" within the meaning of Article IX, section 1a. In this case, the City of Portland arts tax exempts certain residents based on their income and household resources. Thus, the tax does take income into account and, as a result, does not amount to a "poll or head tax" within the meaning of the state constitution.

## I.  BACKGROUND

The relevant facts are few and undisputed. In 2012, the Portland City Council referred a proposed Arts Education and Access Income Tax to the Portland voters. According to the voters' pamphlet, the tax was intended to generate funding "to restore arts and music education" in public schools "by providing stable, long-term funding for certified arts and music teachers." Official Voters' Pamphlet, General Election, Nov 6, 2012, M-54. The voters passed the tax in the general election. After it took effect, the City Council amended it twice in ways that are not pertinent to the issues in this case.

The arts tax is now codified at Portland City Code (PCC) 5.73:

> "A tax of $35 is imposed on the income of each income-earning resident of the City of Portland, Oregon who is at least eighteen years old. No tax will be imposed on filer(s) within any household that is at or below the federal poverty guidelines established by the federal Department of Health and Human Services for that tax year."

PCC 5.73.020. Individuals with under $1,000 in income are not considered "income-earning residents," meaning that they are not taxed. PCC 5.73.010(E).

The city adopted administrative rules to implement the arts tax. Those rules define what "income" includes and does not include within the meaning of the tax:

> "A.   'Income' includes, but is not limited to, all income earned or received from any source. Examples of income include, but are not limited to, interest from individual or joint savings accounts or other interest bearing accounts, child support payments, alimony, unemployment assistance, disability income, sales of stocks and other property (even if sold at a loss), dividends, gross receipts from a business and wages as an employee. 'Income' does not include benefits payable under the federal old age and survivors insurance program or benefits under section 3(a), 4(a) or 4(f) of the federal Railroad Retirement Act of 1974, as amended, or their successors, or any other income a city or local municipality is prohibited from taxing pursuant to applicable state or federal law.

> "1.   Examples of income the city is prohibited from taxing include, but are not limited to, Social Security benefits, Public Employee Retirement (PERS) pension benefits, federal pension benefits (FERS) and income from US Treasury bill notes and bonds interest.

> "2.   Effective for tax years that begin on or after January 1, 2015, U.S. Department of Veterans Affairs (VA) disability benefits will not be considered taxable income for purposes of the Arts Tax."

Revenue Division, Arts Education and Access Income Tax Administrative Rules, https://www.portlandoregon.gov/revenue/article/434547 (accessed Sept 12, 2017).

Plaintiff is a resident of Portland who is subject to the arts tax. He filed a "Complaint for Disparate Treatment and Unconstitutional Taxation," which alleged three claims. Two of the claims concern a dispute between plaintiff and the city's Water Bureau; those claims are not at issue in this appeal. The third claim challenged the constitutionality of the city's arts tax under Article IX, section 1a, of the Oregon Constitution. Plaintiff alleged that the tax "fits perfectly the definition of a capitation or poll tax: 'a levy of a fixed amount on all persons, or a selected group of persons, within the taxing area, imposed without reference to property, income or activity.'" He asked the court to declare the arts tax unconstitutional and to enjoin the city from collecting it.

Both plaintiff and the City of Portland filed motions for summary judgment on the arts-tax claim. The trial court denied plaintiff's motion and granted the city's motion, explaining that the arts tax is not a prohibited poll or head tax, given that it takes into consideration the income of taxpayers:

> "The Arts Tax is not a head or poll tax because it is not assessed per capita. In assessing the tax, the City considers persons' income in three distinct provisions: the tax applies only to (1) income exceeding $1,000, (2) non-exempt income sources, and (3) income of individuals residing in households with income above the federal poverty guidelines. Taxpayers who are under the age of 18 are exempt from the tax. The practical effect of the tax is to tax income of certain City residents within a certain income range and is therefore not a poll or head tax."

The court entered a limited judgment dismissing plaintiff's arts-tax claim.

Plaintiff appealed, arguing that the trial court erred in concluding that the city's arts tax did not violate the state constitutional prohibition on the imposition of a poll or head tax and in dismissing his claim. The city responded that the trial court's decision was correct. The arts tax, argued the city, is not a prohibited poll or head tax because it is assessed only against income from certain sources that rises above a certain level and takes into account household resources.

The Court of Appeals affirmed the dismissal of plaintiff's arts tax claim. *Wittemyer v. City of Portland*, 278 Or App 746, 747, 377 P3d 589 (2016). The court reasoned that, by the time Article IX, section 1a, was adopted, the terms "poll tax" and "head tax" were commonly understood to refer to a very limited form of taxation that did not take income or resources into account in any way. The court explained that, at that time, "'poll or head tax' had a precise and particular meaning that did *not* include measures with exemptions based on the amount or source of individual or household income. Rather, 'poll or head' taxes were levied uniformly without financial exemption." *Id.* at 754-55 (emphasis in original). The court concluded that, because the Portland arts tax takes into account income and resources, it does not run afoul of the poll or head tax prohibition of Article IX, section 1a. *Id.*

## II.  ANALYSIS

On review before this court, plaintiff reprises his contention that the city's arts tax violates Article IX, section 1a. According to plaintiff, the fact that the tax includes exemptions for persons of limited means is irrelevant to a determination whether the tax is a poll or head tax within the meaning of the state constitution. He notes that, throughout history, poll or head taxes have included such exemptions and not, as a result, lost their character as poll or head taxes. He cites as an example a road poll tax that the Oregon legislature imposed in 1893, which exempted all women and children, as well as males under 21 and over 50 years of age. He notes that, in spite of those exemptions, the legislature referred to the tax as a "road poll tax." In plaintiff's view, the existence of exemptions from taxation—for whatever reason—is beside the point; the controlling fact is whether the tax applies uniformly to all persons who are subject to the tax.

*Amicus curiae* Bogdanski similarly argues that the city's arts tax violates Article IX, section 1a, because "the amount of the tax is identical for all individuals who are required to pay it." *Amicus* Fruits adds to plaintiff's historical examples by noting that poll or head taxes have included

exemptions based on income and not lost their character as poll or head taxes.

The city reprises its contention that its arts tax does not violate the state constitutional prohibition against levying poll or head taxes because the tax takes into account sources of income, level of income, and household resources. The city argues that early historical examples of flat taxes that included income-based exemptions were actually "capitation" taxes, which the city contends are not the same as poll or head taxes. According to the city, to constitute a poll or head tax, the tax must not take income or resources into account in any manner.

The parties' arguments present to us a question of constitutional interpretation: What does Article IX, section 1a, mean when it refers to a "poll or head tax"? We construe the Oregon Constitution in accordance with settled principles of interpretation, which require us to examine the text of the provision in dispute in its historical context, along with relevant cases interpreting it. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). In the case of constitutional amendments adopted by initiative, our analysis also includes "sources of information that were available to the voters" at the time the amendment was adopted, including the ballot title, information in the voters' pamphlet and contemporaneous news reports and editorials. *State v. Sagdal*, 356 Or 639, 642-43, 343 P3d 226 (2015). The goal is to "determine the meaning of the provision at issue most likely understood by those who adopted it." *Couey v. Atkins*, 357 Or 460, 490-91, 355 P3d 866 (2015). That analysis then provides the basis for identifying, "in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances." *State v. Davis*, 350 Or 440, 446, 256 P3d 1075 (2011).

In this case, our analysis reveals that, at the time of the adoption of Article IX, section 1a, the phrase "poll or head tax" would have been understood to constitute a tax that applied uniformly on a per-person basis, but did not take into account income, property, or resources in any fashion, even in defining exemptions from the tax. Thus, an

otherwise uniform tax that exempted certain individuals by income level would not have been regarded as a forbidden tax. At earlier times, the phrase may well have had a broader meaning, one that applied to any tax assessed uniformly on a per-person basis, regardless of the nature of exclusions. But beginning in the early to mid-nineteenth century, courts, commentators, and legislatures began to view the meaning of the term more narrowly. By the time that Oregon voters adopted the constitutional prohibition, the term was understood to apply only to a tax that did not take into account income, property, or other resources in any way.

A.   *Textual Analysis*

We begin with the text of Article IX, section 1a, which provides that "[n]o poll or head tax shall be levied or collected in Oregon." The constitution does not define what it means by the phrase "poll or head tax." When the constitution does not define its terms, we presume that those who adopted them intended or understood such terms to be given their ordinary meanings. *State v. Lane*, 357 Or 619, 624-25, 355 P3d 914 (2015). Contemporaneous dictionary definitions provide a helpful starting point in our determination of that ordinary meaning. *Doe v. Corp. of Presiding Bishop*, 352 Or 77, 90, 280 P3d 377 (2012).

As we have noted, Article IX, section 1a, was adopted by the voters in 1910. At that time, there was a well-understood meaning of what constituted a "poll" or "head" tax, words that were commonly used as synonymous with a "capitation" tax. Each of them referred to a tax on the head of each individual, without regard to income or property or other resources. The 1907 edition of *Webster's*, for example, defined a "poll tax" as "a tax levied by the head or poll; a capitation tax," and "capitation" as "[a] tax upon each head or person, without reference to property; a poll tax." *Webster's Int'l Dictionary* 214, 1108 (unabridged ed 1907).[1]

_____

[1] Interestingly, although nearly all contemporaneous dictionaries refer to a "poll tax" or a "capitation tax" as a tax levied on "the head," none of those dictionaries includes a separate entry for the term "head tax" itself. The 1907 edition of *Webster's* did include an entry for the term "head money," which it defined as "a capitation tax; a poll tax," and "head pence, a poll tax." *Webster's* at 676. The 1910

Contemporaneous law dictionaries were to similar effect. The 1910 edition of *Black's Law Dictionary*, for example, defined poll tax as "[a] capitation tax; a tax of a specific sum levied upon each person within the jurisdiction of the taxing power and within a certain class (as, all males of a certain age, etc.) without reference to his property or lack of it." Henry Campbell Black, *A Law Dictionary* 911 (2d ed 1910). And it defined a "capitation tax" as "[o]ne which is levied upon the person simply, without any reference to his property, real or personal." *Id.* at 168. *Burrill's Law Dictionary* likewise stated that a poll tax is "[a] tax levied by the head or poll; a capitation tax," Alexander M. Burrill, 2 *A Law Dictionary and Glossary* 3088 (1871), while it defined a "capitation tax" as "[a] tax on the head or person; a poll-tax." Burrill, 1 *A Law Dictionary and Glossary* at 248. The 1897 edition of *Bouvier's Law Dictionary* defines a "poll tax" as "[a] capitation tax; a tax assessed on every head, *i.e.*, on every male of a certain age, etc., according to statute," John Bouvier, 2 *Bouvier's Law Dictionary* 696 (1897), and a "capitation tax" as "[a] poll tax." Bouvier, 1 *Bouvier's Law Dictionary* at 284. Other law dictionaries from the era define "poll tax" in similar fashion. *See, e.g.*, Benjamin Vaughn Abbott, 2 *Dictionary of Terms and Phrases Used in American or English Jurisprudence* 286 (1879) ("a tax of a specific sum upon each person, as distinguished from a tax on property"); Stewart Rapalje & Robert L. Lawrence, 2 *Dictionary of American and English Law* 973 (1883) ("[a] capitation tax"); William C. Anderson, *A Dictionary of Law* 784 (1893) ("[a] tax upon individual persons").

Three observations are worth noting at this early juncture in our analysis. First, the term "poll tax" was not originally understood solely—or even primarily—to refer to a tax imposed as a condition of voting. Rather, the word "poll" originates from a Middle English word for "head."

edition of *Black's* likewise included an entry for "head money," which it defined as "a capitation or poll tax." *Black's* at 563. The use of the term "head tax" is apparently of more recent vintage than its synonyms "poll tax" and "capitation tax." The earliest reference to a "head tax" in American case law, for example, is *Lin Sing v. Washburn*, 20 Cal 534, 550 (1862) ("[C]an a direct head-tax be levied on one man and not on another?").

12 *The Oxford English Dictionary* 37 (2d ed 1989). And a "poll tax" was simply a tax on each head. *See generally* Brian Sawers, *The Poll Tax Before Jim Crow*, 57 Am J Legal Hist 166 (2017). In fact, poll taxes were imposed long before ordinary people could vote.[2] In the United States, payment of a poll tax was sometimes made a condition of voting, and that practice later came to predominate colloquial understanding of the term. *See generally* David Schultz & Sarah Clark, *Wealth v. Democracy: The Unfulfilled Promise of the Twenty-Fourth Amendment*, 29 Quinnipiac L Rev 375, 378 (2011) ("A poll tax in the United States has come to be understood as some fee paid by an individual as a prerequisite to being allowed to vote.").[3] But there is no evidence that, at the time the voters adopted Article IX, section 1a, of the Oregon Constitution, the ordinary meaning of the term was limited to that use.

Second, the words "poll" and "head" were used interchangeably in reference to taxation. It is true that this court often relies on a presumption that when the people or legislatures used different words, they intended those words to have different meanings; application of that presumption would suggest that "poll" taxes are somehow distinct from "head" taxes. *See, e.g.*, *Monaghan v. School Dist. No. 1, Clackamas County*, 211 Or 360, 366-67, 315 P2d 797 (1957) ("In construing the organic law, the presumption and legal intendment are that every word, clause, and sentence therein have been inserted for some useful purpose."); *Baker v. Croslin*, 359 Or 147, 157, 376 P3d 267 (2016) (alternative

---

[2] The use of the term "polling" to refer to voting comes from the same Middle English word for head and refers to the practice of counting heads to determine the number of votes. 12 *The Oxford English Dictionary* at 37.

[3] In the late eighteenth century, states imposed the payment of a poll tax as a condition of voting as a matter of election reform—that is, broadening the franchise from earlier requirements that conditioned the right to vote on the ownership of a specified quantity of property. In the early nineteenth century, a number of states abandoned even the poll tax and adopted "universal"—that is, universal white male—suffrage. After the Civil War, however, some states revived the practice of conditioning the right to vote on the payment of a poll tax as a means of preventing newly freed slaves from voting. *See generally* Schultz & Clark, 29 Quinnipiac L Rev at 382-93. The practice was ultimately prohibited by the ratification of the Twenty-Fourth Amendment to the United States Constitution, at least as to federal elections. *See generally* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 269-71 (2000).

terms do not mean the same thing, unless there is evidence of the statute to the contrary).[4]

But that is a presumption only, one that may be rebutted by evidence that words at issue were intended or understood to be synonymous. As this court explained in *State v. Cloutier*, 351 Or 68, 97-98, 261 P3d 1234 (2011), occasional redundancy "is a fact of life and of law." Legal terminology often employs synonyms, "sometimes for clarity, sometimes for emphasis." *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 397, 737 P2d 595 (1987); *see also* David Mellinkoff, *The Language of the Law* 363, 345-364 (1963) ("Legal tradition still makes it fashionable to use many phrases made up of synonyms."). This appears to be such a case, when dictionary definitions—and as our discussion of the historical context below makes clear, case law and other sources as well—consistently used the terms interchangeably.[5]

Third, the phrase "poll or head tax" also appears to be synonymous with the term "capitation tax." Dictionary definitions repeatedly use the term "capitation" as a synonym with "poll" or "head" in reference to taxation. The point is significant because early history supplies a number of examples of "capitation taxes" that included exemptions based on income or poverty. The city argues that those examples are inapt, because capitation taxation was distinct from poll or head taxation. We have found no evidence of

---

[4] *Amicus* Bogdanski, in fact, draws significance from the fact that the constitution refers to the two different terms, arguing that "the voters outlawed a 'poll *or* head tax,' *** thus indicating that the label placed on the tax is not controlling. If the voters had outlawed only a 'poll tax,' a taxing authority imposing the identical type of charge individuals might have been free to argue that its tax was instead a 'head tax.'" (Emphasis in original.)

[5] Contemporaneous usage confirms that the two words were regarded as interchangeable. For example, in a 1911 letter to the editor of the *Morning Oregonian*, the writer (identified only as "Voter and Taxpayer") stated that, "[i]nasmuch as the road tax is a head tax, therefore legally a poll tax ***." *Poll Tax and Road Tax*, Morning Oregonian, March 13, 1911, at 6. For another example, consider an 1896 letter to the *San Francisco Call*, in which the writer complained of having to pay "a State poll tax, a county poll tax, and a town poll tax—$6 altogether. This is the most outrageous head tax collected in this State." *The Odious Poll Tax*, San Francisco Call, March 15, 1896, at 20.

that distinction, however.[6] As our discussion of the historical context for the adoption of the poll or head tax prohibition shows, while there may have been different notions about what constituted a "poll" or "head" or "capitation" tax at different points in time, the fact remains that the three terms have always been used interchangeably.

At the time Oregon voters adopted Article IX, section 1a, then, the ordinary meaning of "poll or head tax," was a tax uniformly imposed on each individual without reference to income, property, or other resources. That ordinary meaning suggests that a tax like the city's art's tax, which contains an exemption that is explicitly based on the income and household resources of taxpayers, would not constitute a "poll or head tax" within the meaning of Article IX, section 1a.

Plaintiff and *amici* argue, though, that the ordinary meaning that we have described cannot be reconciled with historical examples of poll taxation that included exemptions based on poverty. That must mean, they contend, that an otherwise uniform tax does not lose its character as a "poll or head tax" if *exemptions* are based on income, property, or other resources. All that counts, plaintiff argues, is whether income, property, or other resources are taken into account with respect to the amount of the tax itself.

That is a fair point. If examples of actual poll taxes—especially examples at the time Article IX, section 1a, was adopted—included exemptions based on income, property, or other resources, then it is likely that such exemptions would have been understood to be irrelevant to whether a tax was a "poll or head tax." To address that contention requires

---

[6] The city cites James R. Campbell, *Dispelling the Fog About Direct Taxation*, 1 Brit J Am Legal Stud 109, 124 (2012), for the proposition that "capitation" taxes were distinct from "poll or head taxes," at least before the nineteenth century. Campbell does suggest that distinction. But it appears to be contradicted by dictionaries of the era, *see, e.g.*, John Ash, *The New And Complete Dictionary of the English Language* (1775) (defining "capitation" as "[a] numeration of the people by the head, a poll tax"), and by multiple examples of contemporaneous usage, as, for example, when Hamilton stated that the reference to "direct" taxation in Article I, section 9, of the federal Constitution referred to "Capitation or Poll taxes." Maeva Marcus, *The Documentary History of the Supreme Court of the United States, 1789-1800* § 7, 467 (2003).

a more thorough examination of the ways in which poll or head taxes have been used and described in history. We turn, then, to the broader historical context within which the voters of Oregon adopted Article IX, section 1a.

B.   *Historical Context*

Poll or head taxes are ancient in origin. But the precise nature of what constituted a "poll" or "head" tax did not remain constant throughout history. As modern scholars have noted, there are distinct histories concerning the use of poll taxes. "Each history carries with it a unique set of meanings[.] *** Depending on which genealogy one draws upon, the poll tax takes on a different meaning and purpose." Schultz & Clark, 29 Quinnipiac L Rev at 378.

Briefly, early European poll taxes began as uniform, flat taxes applied to all individuals. Obvious inequities inherent in applying a flat tax to all individuals—without reference to resources—led to the imposition of poll taxes that were graduated, usually by class or rank. The American colonies at first adopted such graduated poll taxes, sometimes exempting the poor or disabled. But, beginning in the early to mid-nineteenth century, American conceptions of what constituted a "poll," "head," or "capitation" tax narrowed, so that such taxation came to be understood to apply only to taxation that did not take income, resources, or property into account in any way, including defining exemptions. By the twentieth century, examples of "poll," "head," or "capitation" taxes that included exemptions based on ability to pay had disappeared completely.

1.   *Middle Eastern and European poll taxes*

In Biblical times, individuals were subject to four kinds of direct taxes: "income taxes, property taxes, special assessment taxes, and poll or capitation taxes." Manuel L. Jose & Charles K. Moore, *The Development of Taxation in the Bible: Improvements in Counting, Measurement, and Computation in the Ancient Middle East*, 25 Acct Historians J 63, 64 (1998). The poll tax first appears in the book of Exodus, in which a tax is levied on each Israelite over the

age of 20 at the time of their departure from Egypt. *Exodus* 30:12. Poll taxes appear again in Nehemiah and again in the book of Matthew in the New Testament. *Nehemiah* 10:32; *Matthew* 17:24-27.

In Roman Egypt, individuals were subject to a *tributum capitis*, that is, a capitation or poll tax. Dominic Rathbone, *Egypt, Augustus, and Roman Taxation*, 4 Cahiers du Centre Gustave Glotz 86-87 (1993). The tax applied only to Egyptian subjects and their slaves, not to the Roman citizens or their slaves. *Id.* at 88. In the third century B.C.E., both men and women were subject to a flat tax, referred to as a "capitation tax," though men paid a slightly higher uniform rate than women did. *Id.* at 90-91.

In the fourth through sixth centuries C.E., a poll tax was levied on the residents of Sassanid Babylon, which is now much of Iraq and Syria. David M. Goodblatt, *The Poll Tax in Sasanian Babylonia: The Talmudic Evidence*, 22 J Econ & Social Hist Orient 233 (1979). The poll tax exempted "nobles, magnates, soldiers, priests, scribes, and members of the royal bureaucracy." *Id.* at 277. It applied to individuals between the ages of 20 and 50, likely only males but potentially women as well. *Id.* at 277, 289. And Byzantine emperors also imposed a universal poll tax beginning in the seventh century C.E. *See* Leslie Brubaker & John Haldon, *Byzantium in the Iconoclast Era c. 680-850*, at 718 (2011); George Ostrogorsky, *History of the Byzantine State* 137 (Joan Hussey trans, Rutgers University Press rev ed 1969). The Muslim caliphates similarly imposed a poll tax known as *jizya* on all non-Muslim residents. 'Abdal 'Aziz Duri, *Notes on Taxation in Early Islam*, 17 J Econ & Social Hist Orient 136, 137 (1974). In some cases, the tax was imposed at three different rates depending on the financial situation of the individual, but scholars disagree as to whether there was any exemption for poverty. *Compare* Ziauddin Ahmed, *The Concept of Jizya in Early Islam*, 14 Islamic Stud 293, 302 (1975) (describing exemptions for poverty, blindness, illness, and priesthood) *with* Eli Alshech, *Islamic Law, Practice, and Legal Doctrine: Exempting the Poor from the Jizya under the Ayyubids (1171-1250)*, 10 Islamic L & Soc'y 348 (2003) (arguing that no poverty exemption actually existed).

The first poll tax in England was levied in 1377, during the reign of Edward III, on every person over the age of 14. Stephen Dowell, 3 *A History of Taxation and Taxes in England: From the Earliest Times to the Present Day* 5 (1884). The unfairness of subjecting all to the same tax, without reference to rank or resources, led to social unrest; it was a prime cause of the famous Wat Tyler rebellion of 1381. *See generally* Juliet Barker, *England Arise: The People, the King, and the Great Revolt of 1381* (2015). Richard II ultimately modified the tax so that different tax rates applied to different classifications of taxpayers, "calculated by reference to the presumed capability of persons of their class, and paid so much per head." Dowell, *History of Taxation and Taxes in England*, at 6. Individuals not within a specific class paid one groat per head "except real bona fide beggars." *Id*.

In the sixteenth century, Henry VIII imposed a poll tax that again required uniform rates depending on rank and income. *Id*. at 8. A subsequent poll tax contained gradations based on level of the nobility, but for all those below the rank of "gentleman spending 100*l*. per annum *** the meanest throughout the kingdom was not excused under 6*d*." *Id*. at 8-9. In the seventeenth century, another graded poll tax charged fixed amounts linked to specific professions. *Id*. at 10-11.

Poll taxes were abolished after 1698 in England, in part due to their massive unpopularity and in part because "no poll [tax] ever produced anything like the amount reasonably expected. The country gentlemen declined to squeeze pennies from the poor." *Id*. Critics of poll taxes included Adam Smith, who complained that capitation taxation was "arbitrary and uncertain," III *Works of Adam Smith: The Nature and Causes of the Wealth of Nations* 327-28 (1812), and David Hume, who took issue with their "unavoidable inequality" and called them both "arbitrary" and "dangerous." David Hume, I *Essays and Treatises on Several Subjects* 366 (1809).

At the end of the seventeenth century, France imposed a capitation tax that continued up to the time of the Revolution a century later. It was graduated by as many

as 22 different classes. C.F. Bastable, *Public Finance* 434 (2d ed 1895). The Italian states likewise had a complicated set of graduated capitation taxes. *Id*.

In nineteenth-century Prussia, the general population was subjected to a poll tax. Joseph A. Hill, *The Prussian Income Tax*, 6 Q J Econ 207 (1892). It was collected in the amount of "one-half thaler a year, from all persons over twelve years of age, without regard to differences of wealth or social station." *Id*. When Prussia faced significant economic difficulties, the uniform poll tax was abandoned, and the government substituted a "class tax" with twelve different gradations of tax rate, only the lowest of which was the same as the previous poll tax. *Id*. at 209. The new class tax was expected to avoid "the injustice of exacting as much from the poorest as from the wealthiest citizen," as had occurred with the poll tax, and instead "would take into account, indirectly at least, differences in wealth." *Id*. at 210.

2.	*American poll taxation*

Poll or head taxes have a long history in this country as well. In 1619, Virginia became the first colony to impose a poll tax. The tax "applied to free men regardless of occupation or the amount of property" they owned. Edward T. Howe & Donald J. Reeb, *The Historical Evolution of State and Local Tax Systems,* 78 Soc Sci Q 109, 110 (1997). Poll taxes were almost ubiquitous in the colonies before the Revolution and continued in many states afterward. Harvey Walker, *The Poll Tax in the United States*, 9 Bull Nat'l Tax Ass'n 46, 47 (1923). The taxes were generally levied "upon all electors, regardless of sex" when imposed for the support of schools, and on "able-bodied males" of voting age when imposed for the upkeep of roads. *Id.* at 49.

Early American poll taxes included exceptions. Some states, for example, excepted volunteer firemen, soldiers, or mariners at sea. *Id.* at 50. Others carved out exceptions based on the income or resources of the taxpayers. *See generally* Robert G. Natelson, *What the Constitution Means by "Duties, Imposts, and Excises"—and "Taxes" (Direct or Otherwise)*, 66 Case Western Reserve L Rev 297, 316-17 (2015) ("American legislatures could, and often did, reduce

or eliminate the poll tax due from the poor."). Connecticut, for example, allowed exceptions from its poll tax for hardship and poverty. *Public Records of the State of Connecticut from May, 1778, to April, 1780*, at 302 (Charles J. Hoadly ed. 1895). New Hampshire similarly imposed a poll tax on all males between 18 and 70 years except, among others, "paupers." XXI *Early State Papers of New Hampshire* 124 (Albert Stillman Batchellor ed. 1892). Massachusetts levied a poll tax but provided for tax reductions for "persons who through age, infirmity or poverty are unable to pay." Commonwealth of Massachusetts, *The Acts and Laws of the Commonwealth of Massachusetts* 170 (Boston 1890).

In a related vein, poll taxes levied to fund roadwork, which were assessed only against able-bodied males over a specified age, sometimes included exceptions for those who could not afford to pay them. Such individuals were not actually exempted from paying the tax, however; they were allowed to contribute labor in an equivalent amount. For example, a person who could not afford to pay a three-dollar poll tax instead could spend three days repairing the roads. M.K. McKay, *History of the Poll Tax in Illinois*, 12 J Ill St Hist Soc'y 41, 42-43 (1919); *Operation of Poll Tax in Iowa*, 6 Publications Am Stat Ass'n 53, 53-54 (1898).

Even with such exceptions and alternate methods of payment, poll taxes were unpopular in America from early on. Maryland's *Declaration of Rights* asserted that "levying taxes by the poll is grievous and oppressive, and ought to be abolished." Maryland Constitution, art 13 (1776). The United States Constitution itself, in Article I, section 9, provides that "[n]o capitation, or other direct, Tax shall be laid," unless apportioned according to population. Opponents railed against poll taxes as "abhorrent to the feelings of human nature." 6 *The Documentary History of the Ratification of the Constitution* 1251 (John P. Kaminski & Gaspare J. Saladino eds. 2000). Alexander Hamilton acknowledged that he was "as much opposed to a capitation as any man" and that poll taxes were commonly regarded as "tyrannical." 12 *The Documentary History of the Ratification of the Constitution* 1984 (John P. Kaminski & Gaspare J. Saladino eds. 2008). Throughout the nineteenth and into

the twentieth centuries, the poll tax continued to be criticized in similar terms.[7]

In response to such criticism, state taxation increasingly took income, resources, and property into account. Some states graduated taxation on the basis of occupations as a surrogate for ability to pay, levying what were known as "faculty taxes"—based on the ability, or "faculty," of an individual to pay. Those taxes were the progenitors of the modern income tax. At the same time, states shifted to taxation of property itself, as opposed to taxation of persons. As a late-nineteenth-century treatise on public finance explained, "[t]he equal taxation of persons by poll taxes, or capitations, generally develop[ed] by some form of graduation into an income tax." Bastable, *Public Finance* at 433.

Poll taxation did not disappear. But an understanding of what it amounted to changed. In earlier times, a tax that took into account income, resources, or property might still be called a "poll tax." By the late-nineteenth century, however, the opposite came to be the case. For example, Thomas Cooley's treatise on the law of taxation discussed capitation or poll taxes, noting:

> "These are not a common resort in modern times, and only in a few cases could they be either just or politic. As they regard only the person, they must be shared equally by all,

---

[7] Poll taxation usually was criticized on the ground that it failed to take into adequate account the taxpayer's ability to pay. As one early twentieth century writer put it:

> "The characteristics of a good tax are: (1) ability to pay; (2) minimum cost of collection; and (3) maximum benefits received. The poll tax violates at least two of the foregoing principles. It does not take into consideration ability to pay or the benefits received."

C.T. Malan, *A History of the Poll Tax in Indiana*, 31 Ind Mag Hist 324, 326-28 (1935). Complaints about poll taxation were a frequent feature of newspapers at the time, especially at the turn of the century. *See, e.g.*, *The Poll Tax*, Sausalito News, December 26, 1896, at 2 ("The worst feature of the poll tax after its general injustice is the fact that it is not and cannot be uniformly imposed and collected."); *Topics of the Day*, The Independent, March 31, 1898, at 3 (referring to the poll tax in Hawaii as "the most unjust of all taxes"); *A Relic of the Dark Ages*, Los Angeles Herald, June 26, 1898, at 18 ("The law is a disgrace and degradation to free Americans."); *An Important Point*, Arizona Republican, October 15, 1900, at 2 ("[T]he poll tax is unjust."); *Anti Poll Tax*, The Topeka State Journal, April 24, 1900, at 3 ("The poll tax is one of the most unjust that bears upon the poor.").

except under governments where privileged orders are recognized, and where they might be graded according to the orders to which the several persons taxed belong. *If the tax is graded by property, it is obviously something besides a capitation tax*."

Thomas M. Cooley, *A Treatise on the Law of Taxation, Including the Law of Local Assessments* 18 (1881) (emphasis added).

By 1900, the idea of what constituted a "poll tax" in America had shifted to a tax that uniformly applied to each individual taxpayer, with no consideration of income, property, or other resources whatever. Although poll taxes still existed throughout the United States at the time, they no longer included exclusions based on income, property, or other resources; such exclusions were regarded as having the effect of transforming the tax from a poll tax to something else.[8]

Writings of the time distinguished "a uniform poll-tax" from "a tax varying with the wealth or income of the taxpayer." Max West, *The Income Tax and the National*

---

[8] We have identified one arguable exception that existed as of 1910. A 1909 North Carolina statute authorized county commissioners, on a case-by-case basis, to relieve individuals of the obligation to pay a local poll tax "on account of poverty or infirmity." Public Laws of the State of North Carolina, Session of 1909, chap 440, § 11 (1909). The tax law itself, however, did not state any particular exclusion on the basis of income, property, or other resources. Nor did the law state at what level of resources the tax would no longer apply. Rather, it simply authorized a local government body to relieve an individual from the tax in its discretion.

*Amicus* Fruit also argues that road poll taxes, which existed until the early twentieth century, should be understood to have included exemptions based on ability to pay. He reasons that such taxes, which typically applied to men below the age of 50, "stand in as a reasonable approximation of the top end of earning years" at the time. We have found no support for such an interpretation of road taxes. To begin with, the fact that age 50 was at the top end of earning years at the time does not explain why the tax applied to males as young as 21. Aside from that, the historical evidence suggests a different reason for the age range. As we have noted, the widespread practice was for such taxes to apply to "able bodied" males of specified age to pay the tax or, in lieu of paying the tax, to provide labor for a specified number of days. *See, e.g.*, McKay, 12 J Ill St Hist Soc'y at 42-43 (referring to the levy of road taxes on a "labor basis"). The range of ages was more likely aligned with the ages of men most likely capable of performing such work. Thus, while poll taxes levied for the support of schools applied to all electors, road taxes were levied only on "able-bodied males." Walker, 9 Bull Nat'l Tax Ass'n at 49.

*Revenues,* 8 J Pol Econ 433, 434 (1900). A standard taxation treatise of the time, for instance, made the following observations about the nature of poll taxation:

> "In a strictly economic sense the essential requisite of a 'poll' or 'head' tax is that it be laid on all polls or heads, and be unvarying in amount. \*\*\* *So soon, however, as the amount of the tax enacted is made dependent upon the amount of the property owned, the tax ceases to be a varying poll tax, and becomes a tax on the property itself.*"

David Ames Wells, *The Theory and Practice of Taxation* 330 (1900) (emphasis added). A 1908 text similarly observed that "[i]n some taxes it is impracticable to introduce a progressive scale, \*\*\* as, e.g., tithes or poll taxes,—*for a graduated poll tax is really not a poll tax at all*, but a class tax." E.R.A. Seligman, *Progressive Taxation in Theory and Practice*, 9 Am Econ Ass'n Q 300 (1908) (emphasis added). And a U.S. Census Bureau report of the same era defined a poll tax as "a direct personal tax, usually on males, in certain classes, apportioned, as the name implies, at so much per head." U.S. Dep't of Commerce & Labor, *Wealth, Debt and Taxation* 618 (1907). The report contrasted taxation of "persons, natural or corporate, in proportion to their property," which ceased to be poll taxation and amounted to property taxation. *Id*.

That shift in understanding about what constituted a "poll tax" is at odds with earlier ideas and practices, to be sure. In fact, commentators at the time noted that very point. Wells' *Theory and Practice of Taxation*, for example, observed that "[t]he popular idea of a poll tax in the United States" is "not, however, in accord with historical experience." *Id.* at 330. Contrasting then-current taxation practices with those of the colonial era, Wells stated that, "instead of having a fixed sum, *as was subsequently the rule in assessing a poll tax*, the value of the poll was rated according to the earning capacity of the individual." *Id.* at 334 (emphasis added).

In short, although earlier in American history the poll tax had a broader meaning, by 1900 it referred to taxation that did not take into account income, property, or resources in any manner. If a tax took such things into account—even in defining exemptions from an otherwise

uniform tax—it was regarded as something other than a poll, head, or capitation tax.

### 3.   *Nineteenth-century case law*

Most state constitutions contained dollar limits on the amount of a poll or capitation tax that could be levied in any given year. And a number of taxes were challenged on the ground that, as poll or capitation taxes, they exceeded the annual constitutional limits. Court decisions resolving those disputes uniformly construed a "poll" or "capitation" tax quite narrowly. They did not address the precise question before us, *viz*., whether a "poll or head tax" is a tax that includes exemptions based on income, property, or other resources. But they did contain discussions concerning the nature of poll taxation—discussions that defined the poll tax fairly categorically as a tax that does not take such matters into account in any fashion.

The North Carolina Supreme Court's decision in *Gardner v. Hall*, 61 NC 21 (1866), provides a useful illustration. In that case, the state legislature imposed a uniform tax on each person who travelled by rail. The plaintiff argued that the tax amounted to a poll tax and, as such, exceeded the annual limit on poll taxation under the state constitution. The court rejected the argument, explaining that, "[a] capitation tax is one upon the person simply, without any reference to his property, real or personal, or to any business in which he may be engaged or to any employment which he may follow." *Id*. at 22. In this case, the court concluded, the tax was levied on an individual's use of the railway. As such, the court said, "the impost is not a capitation, that is, it is not a tax upon his poll or head, simply." *Id*.

In *Short v. State*, 80 Md 392, 31 A 322 (1895), the Maryland Court of Appeals addressed whether a state law requiring all able-bodied males between the ages of 21 and 51 to spend two days repairing roads or pay a fee in lieu of that labor was a "poll tax" prohibited by the state's constitution. The court ultimately concluded that a law requiring labor was not a "tax," but the court's opinion included an extended discussion of the nature of poll taxation and the reason for the state constitutional prohibition. In the

court's view, "[s]uch taxes [were] levied without reference to the ability or the means of the 'taxable' to pay" and thus were "burdensome and oppressive." *Id*. at 323. Other state court cases adopted a similarly narrow view of poll taxation, one that—by definition—omitted any consideration of a taxpayer's ability to pay. *See, e.g.*, *State v. Gazlay*, 5 Ohio 14, 21 (1831) (poll taxes are those "imposed numerically upon citizens, without any reference to their capacity of sustaining the burden"); *State v. Broadnax*, 128 SW 177 (Mo 1910) ("A poll tax does not depend upon the income or earning capacity of the person subject to it."); *Thurston County v. Tenino Stone Quarries*, 44 Wash 351, 356, 87 P 634 (1906) ("The underlying nature and purpose of a poll tax are disassociated entirely from any consideration of property.").[9]

The United States Supreme Court issued several opinions concerning what constitutes a "direct" tax that requires apportionment under Article I, section 9, of the federal Constitution. In each of those cases, the Court mentioned taxes on land and capitation taxes as examples of the limited sort of taxes that are "direct" capitation taxes. And, as did the state courts we have cited, the Court adopted a similarly narrow view of what constituted a capitation tax. In *Hylton v. United States*, 3 US 171, 1 L Ed 556 (1796), for example, the Court addressed the constitutionality of a congressional tax on carriages. Justice Chase suggested that the tax on carriages was not a "direct" tax, because such direct taxes were limited to land levies and "a capitation or poll tax," that is, a tax "without regard to property, profession, or any other circumstance." *Id*. at 175 (*seriatim* opinion).[10] A century later, in *People of State of New York ex rel.*

---

[9] Arguments of counsel during the nineteenth century consistently reflect the same understanding of what constituted a "poll tax." In *Blessing v City of Galveston*, 42 Tex 641, 649 (1875), for example, counsel argued without dispute that

"it is in the nature of a poll tax; that property, income, or salary, forms no part of the subject; that the tax is to be imposed *** without reference to property, either in amount or kind, without reference to any income or capital that the persons may have, or may receive, or may employ in the pursuit of their occupations; that the tax is to be imposed without reference to personal skill or energy, to success or failure, or to the accommodations of a hotel, or to the amount of deposits in a bank, or stalls in a stable ***."

[10] Justices Patterson and Iredell joined Chase as to the limited nature of "direct" taxation. 3 US at 177 (Patterson, J.), 183 (Iredell, J.).

*Hatch v. Reardon*, 204 US 152, 159-60, 27 S Ct 188, 190, 51 L Ed 415 (1907), the Court referred to "the poll tax of a fixed sum, irrespective of income or earning capacity."[11]

Interestingly, the historical accuracy of Supreme Court's remarks about the limited nature of poll taxation has been called into question by some scholars. Professor Robert Natelson, for example, contends that the Court's description of a capitation tax as in no way taking into account income, property, or other resources was "unquestionably false," given the fact that capitation taxation in the early Republic not infrequently created exemptions on those very bases. Natelson, 66 Case Western Reserve L Rev at 349. But such criticism only serves to bear out the point that such an understanding of what constituted a capitation tax was prevalent, even if historically erroneous.[12]

### 4.   *Poll taxes in Oregon*

The very first compulsory tax levied by the Oregon provisional government included a poll tax of 50 cents for each adult male. Leslie M. Scott, *First Taxes in Oregon, 1844*, 31 Or Hist Q 1 (1930). The territorial legislature continued the tax in 1854. F.G. Young, *The Financial History of the State of Oregon*, 10 Or Hist Q 263, 282 (1909). And, following statehood, the Oregon Legislature adopted a poll tax "to defray current expenses of the state." *Id*. Firefighters were exempted from the poll tax in 1870. Members of the state militia were relieved of paying the tax shortly after that. *Id*. A road poll tax was later added that required "[e]very male

---

[11] Also noteworthy—regarding a tax structured very much like the city's arts tax—is a dissenting opinion in *Pollock v. Farmers' Loan & Trust Co.*, 158 US 601, 15 S Ct 912, 39 L Ed 1108 (1895), a case in which the Court held unconstitutional a tax on interest, dividends, and rent. The tax included an exemption for families earning less than $4,000 per year. A majority of the Court reasoned that the tax was, in effect, a tax on land and thus a direct tax that required apportionment under Article I, section 9. *Id*. at 638. Justice Brown dissented, arguing that the tax was not a tax on land. Nor, he contended, was it a capitation tax, *given the exemption based on the income of taxpayers*. *Id*. at 693-94.

[12] Courts in other jurisdictions appear to be influenced by that understanding of what constitutes a "poll tax" down to the present. In *Tiefel v. Gilligan*, 321 NE2d 247 (Ohio Ct App 1974), for example, the court addressed the constitutionality of a uniform tax applied to all Ohio residents who received income in the state, but exempted those with an adjusted gross income of $500 or less. The court concluded that the tax was not an unconstitutional poll tax because of the income exclusion. *Id*. at 251.

inhabitant of this state over twenty-one years of age and under fifty years of age," except firefighters, to pay three dollars annually. Lord's Oregon Laws, title XLII, ch III, § 6326 (1910). Consistently with what we have described as nineteenth-century conceptions of poll taxation, none of the Oregon poll taxes included exemptions based on income, property, or other resources.

From the beginning, the poll taxes were unpopular. It is estimated that only about one-third of the taxable population paid the general poll tax during the 1862-64 biennium. Young, 10 Or Hist Q at 282. By 1905, only about one-tenth paid the tax. *Id*. at 283. As for the road poll tax, according to one Oregon newspaper account of the time, only about one in five persons paid it. *That Poll Tax Fake*, Morning Oregonian, October 30, 1911, at 6.

Objections to poll taxation appeared frequently in local newspapers of the era. The *Oregon City Enterprise*, for instance, referred to the tax as "unjust and difficult to collect." *Abolishing the Poll Tax*, Oregon City Enterprise, January 15, 1909, at 4. The *Coos Bay Times* similarly referred to the tax as "a fraud and an imposition. It should be done away with entirely as unjust." *Poll Tax A Humbug*, Coos Bay Times, January 29, 1910, at 4. The *Daily Capitol Journal* asserted that "[t]he city that would come out boldly and abolish this tax would be considered a progressive community and laboring men would go to such a city to live." *Oregon Boot Method Collecting Poll Tax*, Daily Capitol Journal, March 30, 1910, at 1.

Not surprisingly, the legislature repealed the state poll tax in 1907. Or Laws 1907, ch 228; Or Laws 1907, ch 267. That left only the road poll tax, which, as we have noted, was hardly enforced. In that light, the fact that the voters adopted a constitutional amendment prohibiting further poll taxation in 1910—when poll taxation barely existed in the state—may seem odd. The explanation lies in the fact that the poll-tax prohibition was used as something of a stalking horse for an unrelated tax measure. There was, in fact, more than a touch of scandal associated with the adoption of Article IX, section 1a.

Around the turn of the twentieth century, there arose a "reform" movement influenced by the views of political economist Henry George to reduce state taxation to a single tax on increases in land values.[13] Among such reformers was William Simon U'Ren, who led an effort to place a "single tax" measure on the 1908 ballot. Robert C. Woodward, *W.S. U'Ren and the Single Tax in Oregon*, 61 Or Hist Q 46, 50-51 (1960). The measure failed resoundingly. *Id*. Undaunted, U'Ren came up with an alternative measure, which permitted a single tax at the county level, but which led with a seemingly unrelated prohibition against levying or collecting poll or head taxes:

> "No poll or head tax shall be levied or collected in Oregon; no bill regulating taxation or exemption throughout the state shall become a law until approved by the people of the State at a regular general election; none of the restrictions of the Constitution shall apply to measures approved by the people declaring what shall be subject to taxation or exemption and how it shall be taxed or exempted whether proposed by the Legislative Assembly or by initiative petition; but the people of the several counties are hereby empowered and authorized to regulate taxation and exemptions within their several counties, subject to any general law which may be hereafter enacted."

Official Voters' Pamphlet, General Election, Nov 8, 1910, 72. The measure actually never used the words "single tax." But it eliminated the authority of the legislature to regulate taxes in favor of county authority, which supporters believed would allow them to introduce single taxation gradually, beginning at the county level. Woodward, 61 Or Hist Q at 54.

Although the measure was drafted by the Single Tax League, it was portrayed as emanating from labor unions, which supplied the only explanatory statement to appear in the 1910 Voters' Pamphlet concerning the measure. *Id*. In accordance with the strategy of the measure's

---

[13] According to George, the basic theory of single taxation was that increases in the value of land were "unearned" and so belonged to the public. Taxing the unearned increase in land values, he suggested, would encourage large landholders to break up their holdings, decreasing the concentration of wealth and encouraging the devotion of land to more productive use. *See generally* Robert D. Johnston, *The Radical Middle Class: Populist Democracy and the Question of Capitalism in Progressive Era Portland* 160-61 (2006).

proponents, the Voters' Pamphlet statement emphasized the significance of the elimination of the poll tax and did not mention a single tax:

> "[This measure] will repeal the poll tax, which is the most odious and unjust of all taxes[.] *** With very rare exceptions, the only men who pay the poll tax are a few laborers and men who own real property. The tax is unjust not only because it is collected from very few of the men who are supposed to pay, but also because it bears so unequally on men in proportion to their ability to pay.
>
> "The laborer supporting a family on $2 a day pays exactly the same poll tax as the corporation manager with a salary of ten thousand dollars a year. If the laborer can starve his family into saving fifty cents a day, the savings of six days' labor will just pay his poll tax; the corporation manager can easily save enough to pay his poll tax from his salary for two hours' work. One man lives easily and saves enough to pay his share of the tax with two hours' work; the other lives hard and save enough on sixty hours' work to pay his share of the tax. The odds are thirty to one in favor of the rich man. Is it possible to imagine a more outrageously unjust tax than this?"

Official Voters' Pamphlet, General Election, Nov 8, 1910, 24-25.

The measure passed. But a storm of controversy followed, given that the vote had reversed the decision of the voters to reject the single tax only two years earlier. The verdict was that the voters had been duped by the inclusion of the poll-tax prohibition. *See generally* Gordon B. Dodds, *Oregon: A Bicentennial History* 170-71 (1977) ("[T]he fundamental reason that it passed was that it was stated in a duplicitous manner so that the voter had no idea for what he was voting."). As a *Morning Oregonian* editorial declared shortly after the election:

> "It is not possible, of course, that the people of Oregon intended to reverse their verdict of 1908 as to the single tax. They are not for the single tax, and the single-taxers know it. No measure definitely and clearly proposing single tax would or could have the slightest chance of enactment.
>
> "How, then could this extraordinary measure be so framed as to find favor with the electorate? By the easy and

simple device of adding a catch line abolishing the poll tax. The Oregonian does not hesitate to declare that the majority of the voters of Oregon who permitted themselves to be trapped into approval of this amendment were influenced chiefly by a purpose to do away with the odious head tax. It made no difference that there is no poll tax in Oregon and has not been since 1907, when it was abolished by statute. There it was on the ballot, and the voter struck at it. He killed it forever, as he thought, the unpopular head tax and by the same stroke of the pen inadvertently opened the gates to the triumphant invasion of Oregon by the single taxers.

"* * * * *

"* * * The abolition of the head tax should stand; but the single tax must go."

*Introducing the Single Tax,* Morning Oregonian, Nov 21, 1910, at 6.[14]

The legislature quickly approved a resolution sending to the voters a measure to repeal all of the 1910 measure except the poll-tax prohibition, with legislators railing against it as a "fraud" perpetrated by "soapbox orators" who had "hoodwinked" the people with the lure of eliminating a poll tax that no longer really existed. Woodward, 61 Or Hist Q at 55.[15] And, in 1912, the voters approved the measure. 1913 Or Laws 7 (approving Senate Joint Resolution No. 10 amending Article IX, section 1a, of the Oregon Constitution).

---

[14] Other newspapers around the state similarly complained that the measure had been deviously packaged as a "wedge" to make possible the adoption of a single tax. *See, e.g.*, *Change is Sweeping: New Amendment Opens Way for Single Tax*, Polk County Observer, Nov 22, 1910, at 1 ("The bill is regarded as having been designed as an entering wedge for 'single tax' measures."); *Tax Amendment is Carried*, La Grande Evening Observer, Nov 22, 1910, at 2 (same); *New County Tax Law Inoperative*, East Oregonian, Nov 23, 1910, at 8 (same). The extent to which the voters were actually fooled by the ploy is uncertain. Some modern historians suggest that the voters were well aware of what the single-taxers were up to. *See, e.g.*, Johnston, *The Radical Middle Class* at 163 n 12.

[15] A statement in support of the repeal—prepared by the state Board of Tax Commissioners and a Legislative Tax Committee—similarly explained that the action was necessitated by the fact that the original measure "appeared on the ballot, at the election under an attractive title, not fully expressive of its real purpose, at the same time giving prominence to an incidental feature that was something of a joker, providing for repeal of the poll tax." Official Voters Pamphlet, General Election, Nov 5, 1912, 23.

The circumstances of the adoption of the 1910 amendment certainly are unusual. But, for our purposes, the most significant point is that nothing in the adoption of Article IX, section 1a, either in general or in the statement in support of its passage, suggests that the meaning of "poll or head tax" was different from what we have described as the general understanding of the terms at that time. In fact, to the extent that the framers of what became Article IX, section 1a, used the poll or head tax prohibition as a stalking horse for the single tax initiative, they did so precisely because of the antipathy to poll taxation that was common throughout the country at that time.

C.   *Summary of Analysis*

In sum, then, Article IX, section 1a, prohibits the levying or collection of a "poll or head tax." The ordinary meaning of a "poll" or "head" tax at the time that provision was adopted was that such a tax was uniformly applied on a per capita basis and did not take into account the income, property, or other resources of a taxpayer in any way. Our analysis of the broader historical context of poll taxation shows that, although early poll taxes sometimes did take income, property, or other resources into account without losing their character as poll taxes, by the nineteenth century, the accepted meaning of the term was narrower than that. Case law and treatises from the time demonstrate that a poll tax was understood not to take income, property, or other resources into account in any way.

As we noted at the outset of our analysis, we are not necessarily limited in our interpretation of the state's constitution to the understandings or intentions of those who adopted it a century or more ago. Rather—especially with respect to older, more generally worded provisions of the constitution—we tend to focus on such contemporaneous understandings or intentions for the purpose of identifying underlying principles that may be applied to modern circumstances. *Davis*, 350 Or at 446.

In this case, our analysis of the intended meaning or understanding of the phrase "poll or head taxes," as used in Article IX, section 1a, shows that the underlying concern

was that taxation should take into account the ability to pay in some fashion. Taxation that failed to account for income, property, or other resources in any way were regarded as "unjust" or "unfair." Nothing in the text of the provision or its historical context suggests that, to avoid being a "poll or head tax," a particular method of taking into account the ability to pay was required, however.

Plaintiff and *amici* argue that such a reading of Article IX, section 1a, misses the significance of the statement in support of the measure that appeared in the voters' pamphlet. They argue that the statement makes clear that the problem with poll taxation is that it is not "graduated" or "proportional" to taxpayers' ability to pay.

The argument is unavailing for at least two reasons. First, we are generally reluctant to read too much into a statement in the voters' pamphlet, because of its political nature. *See Sagdal*, 356 Or at 648 ("[W]e use the arguments in the voters' pamphlet with caution due to their political nature * * *."); *see also [Deras v. Myers](#)*, 327 Or 472, 482 n 2, 962 P2d 692 (1998) (Durham, J., dissenting) ("[P]aid written arguments for and against a measure in the voters' pamphlet" may be partisan in nature "and, if so, will shed little or no light on the voters' intention."). Such reluctance seems especially appropriate when, as in this case, the statement was prepared as part of an act of electoral subterfuge.

Second, and in any event, the statement nowhere asserted that taxation must be proportional. Rather, it recited standard arguments in opposition to poll taxation, namely, that poll taxation "bears so unequally" on taxpayers in relation to their ability to pay. Taking into account ability to pay does not necessarily require strictly proportional taxation. Indeed, strictly proportional taxation, by definition, requires application of the same percentage rate regardless of income, which necessarily would preclude any sort of progressive taxation that varies the percentage rate of taxation with ability to pay. Nothing in the text or history of Article IX, section 1a, remotely suggests that its framers or the people who voted for it intended that result. And, in

fact, at oral argument, plaintiff and *amici* conceded that Article IX, section 1a, does not require proportional taxation.

D.  *Application*

Based on the foregoing analysis, we conclude that a "poll or head tax" within the meaning of Article IX, section 1a, is one that applies uniformly on a per capita basis, but does not take income, property, or resources into account in any way. In this case, the city's arts tax takes income and household resources into account in at least three ways.

First, the arts tax does not apply to individuals earning income of less than $1,000 per year.

Second, certain types of income do not count in determining an individual's income for the purpose of in defining who is and who is not subject to the tax. For example, Social Security benefits, federal pension benefits, and state Public Employee Retirement System benefits are not counted.

Third, the tax does not apply if an individual resides in a household with resources lower than federal poverty guidelines. Those federal poverty guidelines, in turn, are graduated according to the size of the household. As a result, the household income threshold below which the arts tax will not be owed increases with the size of the household.

Plaintiff insists that, notwithstanding the income-based exclusions, the city's arts tax does not really take income, property, or other resources into account in setting the tax. In plaintiff's view, to avoid being classified as a poll or head tax, a tax must take income into account in assessing the amount of the tax itself, not just in defining exclusions from the tax. According to plaintiff, an exclusion provides for a tax of zero dollars, which is not an amount of tax at all; it simply does not count in determining whether the arts tax is a prohibited "poll or head tax." Plaintiff agrees that, if the city had adopted a two-tiered tax that required persons below a set income to pay one penny and all others $35, such a tax would not be a prohibited "poll or head tax" within the meaning of Article IX, section 1a, because a penny is an amount of tax. The city's arts tax, he argues,

is different, because its two-tiered scheme requires persons below the income threshold to pay nothing. As plaintiff puts it, "0 is zero - nothing. $35 is the only amount of the Arts Tax."

The premise of that argument is that a tax of zero is not an "amount" of tax. It is a flawed premise for at least two reasons. First, it is contrary to the historical evidence that we have cited above—evidence that suggests that, at least by the early twentieth century, considering income, property, or other resources in establishing exemptions made a tax something other than a poll or head tax.

Second, and aside from that, plaintiff's assumption that zero is not an amount is plainly contrary to ordinary usage. It is fairly common, for example, to refer to a determination that the amount of damages in a given case is zero. *See, e.g.*, *Spearman v. Progressive Classic Ins. Co.*, 361 Or 584, 593, 396 P3d 885 (2017) ("At least in some cases, that amount will be zero."). More important, it is common in the context of state and federal taxation to refer to tax "amounts" to include zero. *See, e.g.*, 20 CFR § 20.2056A-3 ("the minimum amount necessary to reduce the estate tax to zero"); 20 CFR § 2010-2 ("reducing the gift tax liability to zero"); 26 CFR § 52.4682-4 ("For the purposes of computing the floor stocks tax * * * the tentative tax amount is zero."); 26 CFR § 301.6211-1 ("the amount shown as the tax by the taxpayer upon his return shall be considered as zero"); OAR 150-118-0080 ("'[t]o achieve zero Oregon estate tax"); OAR 150-291-0300 ("[i]f a surplus credit reduces tax liability to zero").

As we have noted, plaintiff concedes that a two-tiered tax based on income, property, or other resources is not a prohibited poll or head tax. That is precisely the nature of the city's arts tax. We conclude that, based on the text, historical context, and legislative history of Article IX, section 1a, of the Oregon Constitution, the city's arts tax is not a prohibited "poll or head tax."

The decision of the Court of Appeals and the limited judgment of the circuit court are affirmed.